UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNN T. PASLEY,

                **Plaintiff,**              **CIVIL ACTION NO. 10-CV-11805**

      **vs.**                    **DISTRICT JUDGE ARTHUR J. TARNOW**

                                 **MAGISTRATE JUDGE MONA K. MAJZOUB**

**PATRICIA CARUSO, et al,**

                **Defendants.**

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Lynn Pasley, a Michigan state prisoner, brings this action under 42 U.S.C. § 1983, alleging that Defendants White, Ouelette, Elkins, Lange, and Unhold[1] acted with deliberate indifference to Plaintiff's serious medical needs in violation of Plaintiff's Eighth Amendment rights. (*See* docket nos. 27 and 81.)  Before the Court are Defendant Ouelette's Motion for Summary Judgment (docket no. 165) and Defendant White's Motion to Dismiss or for Summary Judgment (docket no. 180).[2]  Plaintiff filed Responses to Defendants' Motions. (Docket nos. 169 and 186; *see also* docket no. 170-1[3].)  Defendants filed a Replies.  (Docket nos. 174 and 187.)  All pretrial matters

_____

[1]Plaintiff initially alleged the same claims against various other defendants, all of whom have been previously dismissed from this matter.  (*See* docket nos. 38, 119, 124, 142, and 156)

[2]Also pending before the Court are Defendant White's Motion to Compel (docket no. 175) and the Parties' Motions for supplemental briefing regarding the same (docket nos. 182 and 184).  Because the undersigned recommends granting Defendant White's Motion for Summary Judgment, the undersigned will also recommend dismissing these discovery motions as moot.  If, however, the Court does not adopt the undersigned's recommendation with regard to Defendant White, the Court will address these discovery motions in a separate opinion and order.

[3]After responding to Defendant Ouelette's Motion, Plaintiff filed a Motion to Amend/Correct his Response.  (Docket no. 170.)  Defendant Ouelette argued that Plaintiff's Motion should be denied or, in the alternative, that if the Court were to grant Plaintiff's Motion,

have been referred to the undersigned for consideration. (Docket no. 11.)  The undersigned has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation.

## I.      Recommendation

For the reasons that follow, the undersigned recommends DENYING Defendant Ouelette's Motion for Summary Judgment [165].  The undersigned further recommends GRANTING Defendant White's Motion for Summary Judgment [180].  Therefore, the undersigned also recommends DENYING Defendant White's Motion to Compel [175] and the Parties' Motions for supplemental briefing [182] and [184] regarding the same as moot.

## II.     Report

### A.     Facts

According to Plaintiff, on or about September 20, 2008, while incarcerated at the Macomb Correctional Facility, Plaintiff first complained of, and was examined for, a spot on his penis. (Docket no. 27 ¶ 15.)  Plaintiff's medical records reflect that this complaint was communicated on or around December 28, 2008.  (Docket no. 181-1 at 111.)  On January 5, 2009 former-Defendant Geml performed a visual examination of Plaintiff's penis.  (*Id.* at 110.)  Geml's notes indicate that Plaintiff noticed the "rash" on his penis one or two weeks earlier and that Plaintiff did not complain of any pain.  (*Id.*)  Geml diagnosed Plaintiff with hypopigmentation and prescribed a hydrocortisone cream.  (*Id.*)

---

Defendant Ouelette should be permitted to file an Amended Reply.  (Docket no. 173.)  The undersigned has considered certain documents to which Plaintiff cites in his Amended Response (all of which have been previously filed with the Court (docket no. 27 at 12-16)) in making the determination herein and will, therefore, enter an order granting Plaintiff's Motion concurrently with entering this Report and Recommendation. Nevertheless, the Court finds that no Amended Reply from Defendant Ouelette is necessary because, as discussed herein, these documents raise a question of fact.  And regardless of any argument that may be propounded by Defendant Ouelette, the documents must be viewed in a light most favorable to Plaintiff.

On February 12, 2009 Plaintiff was seen by former-Defendant Noronha, whom Plaintiff alleged examined Plaintiff's penis, discontinued the hydrocortisone cream use, and did not put in place another treatment plan. (Docket no. 27 ¶ 18.) Plaintiff's medical records, however, reflect that Dr. Noronha saw Plaintiff with regard to his hypertension and hyperlipidemia. (*See* docket no. 181-1 at 102-09.) Dr. Noronha's notes neither indicate that Plaintiff discussed the spot on his penis with her, nor that she examined his penis. (*See id.*)

The next day, Plaintiff was transferred to the Adrian Temporary Correctional Facility (ATF), where Plaintiff alleges that he explained to the intake nurse that his condition had worsened. (Docket no. 27 ¶ 19.) Plaintiff maintains that the intake nurse told him that she would put him on a list to see the doctor. (*Id.*) While the intake nurse did order follow-up visits for Plaintiff on February 18, 2009, these visits are listed as "new transfer" visits with a nurse and with Defendant White; her notes do not mention any complaints by Plaintiff regarding his penis. (Docket no. 181-1 at 99-101.)

On February 19, 2009, Plaintiff had a follow-up appointment with a nurse, who performed what appears to have been a full physical examination of Plaintiff. (*See id.* at 95-97.) Plaintiff does not appear to have discussed his penile issues with this nurse, but the nurse did note that a "Scan of Skin" revealed no genital ulcers and no urethral discharge. (*Id.* at 96.)

Plaintiff reported to the ATF clinic on February 24, 2009 for a complaint of low blood sugar. (*Id.* at 92.) Plaintiff did not mention any problems with his penis, but he did indicate that "his medications were changed before he [was transferred to ATF], and he wants to discuss his medications with the MP ([Defendant White])." (*Id.*) At that time, Plaintiff was scheduled to see Defendant White three days later. (*Id.*)

In his Amended Complaint, Defendant alleges that he was seen by Defendant White on

March 3, 2009.  (Docket no. 27 ¶ 20.)  It appears, however, that Defendant White did not see Plaintiff until later in March.  On March 7, 2009 Plaintiff sent a kite complaining that he still hadn't met with Defendant White and that his blood pressure medication had not been refilled since he was transferred.  (*See* docket no. 181-1 at 91.)  Plaintiff was told that his medications would be refilled and that he was "on [the] list to be seen" by Defendant White.  (*Id.*)

Plaintiff met with Defendant White on March 20, 2009.  (*Id.* at 79-89.)  Plaintiff states that "[i]t was [his] understanding that [he] was seeing [Defendant] White that day based on [his] earlier requests to see medical staff for the penis pain."  (Docket no. 186-6 at 4.)  In Plaintiff's Amended Complaint, he alleged that he told Defendant White that his condition had worsened and that the spot that was once small had spread over the entire head and foreskin of his penis, the pain had become unbearable, and the small spot had started bleeding.  (Docket no. 27 ¶ 21.)  In his Amended Complaint, Plaintiff alleged that Defendant White did not perform a visual examination or provide any treatment.  (*Id.*)  Plaintiff further alleged that Defendant White stated that she would see Plaintiff at a later time about his condition.  (*Id*. ¶ 22.)

In his Response to Defendant White's Motion, however, Plaintiff states that "[a]s a result of my telling [Defendant] White of my penis pain, she examined it," but she "did not want to deal with the penis pain," and "her refusal to provide medical care for the penis pain" caused him to continue to suffer.  (*Id.* at 3-4.)  Defendant White contends that Plaintiff "made no complaints to [her] regarding his penis, penile discoloration, and/or penile pain," and that "[h]ad [he] made such complaints, [she] would have documented them in the medical record . . . and addressed [them]." (Docket no. 180-3 at 4.)  The records from Plaintiff's appointment with Defendant White show that she performed a full examination of Plaintiff in the Cardiovascular and Endocrine Clinics, but the records do not include any mention of Plaintiff's penile pain, discoloration, or discomfort.  (*See*

docket no. 181-1 at 79-89.)  This was Defendant White's only involvement with Plaintiff; on April

1, 2009, Defendant White was transferred to another MDOC facility.  (Docket no. 180-3 at 4.)

       Plaintiff alleges that on April 2, 2009, former-Defendant Kakani examined Plaintiff's penis

but did not make any diagnosis or set up a treatment plan.  (Docket no. 27 ¶ 23.)  Plaintiff also

alleges that he told Kakani about his pain and also discussed with her the alleged referral for a

biopsy that Geml had suggested.  (*Id.*)  Plaintiff states that Kakani said she would submit a request

for the biopsy.  (*Id.*)  According to Plaintiff's medical records, this examination occurred on April

13, 2009, but Kakani only issued a consultation request.  (Docket no. 181-1 at 67, 70.)  The

consultation-request form noted that the spot on Plaintiff's penis is a "1 cm hypopigmented [a]rea

on the penis [with] no crust [and] no drainage."  (*Id.* at 67.)  She requested that the consultation be

performed within one month.  (*Id.* at 68.)  It does not appear that this consultation ever occurred, but

a note from April 16, 2009, indicates that the request "needs to be resubmitted with description of

lesion on penis & duration." (Docket no. 167. at 12.)  Kakani appears to have amended the request

to note that "pt lesion is as discribed (sic) aboe (sic) has for more than month (sic)."  (*Id.* at 20.)

       On June 24, 2009, Plaintiff was transferred to the Adrian Regional Correction Facility

(ARF).  (Docket no. 27 ¶ 24.)  Plaintiff alleges that when he moved to ARF, he told the intake nurse

about his condition, and he alleges that she told him that she would place his name on the list to see

the doctor or physician's assistant.  (Docket no. 27 ¶ 24.)  The first record from Plaintiff's care at

ARF that was provided to the Court shows a full examination by former-Defendant Jindal but, like

previous records, does not indicate that Plaintiff discussed his penile pain or discoloration.  (*See*

docket no. 181-1 at 19-28.)

       On July 17, 2009, Plaintiff was transferred to the Florence Crane Correctional Facility

(AFC).  (*Id.* ¶ 26.)  He states that, upon his arrival there, he immediately informed the intake nurse

of his condition.  (*Id.*)  He states that the intake nurse informed Plaintiff that she would put him on the doctor or physician assistant list.  (*Id.*)  Again, however, the health-care screened forms completed by the nurse at ARF and at AFC do not indicate that Plaintiff complained of his penile pain or discoloration.  (*See* docket no. 167 at 31-36.)  At the time of his arrival at AFC, Defendant Ouelette, a licensed Physician Assistant,[4] was assigned as his medical provider.  (*Id.* at 35.)

On July 28, 2013, Plaintiff refused all medication from AFC.  (*See* docket no. 181-1 at 15.) On July 31, a note in Plaintiff's medical record indicates that Plaintiff "[d]oes not want medical care from this facility" and that he had refused several of his medications.  (Docket no. 167 at 37.) Plaintiff alleges that he did not see the doctor promptly, so he submitted a health care request and refused all of his medications until a doctor would see him. (Docket no. 27 ¶¶ 27-29.)  On August 4, 2009, Defendant Ouelette scheduled an appointment "to discuss refusal of medications," which was set for "approximately 8/21/2009."  (Docket no. 167 at 38-39.)  And on August 6, 2009, Plaintiff submitted a kite stating, "I am experiencing serious pain around the foreskin and the head of my penis" and noting that he was supposed to have been put on a call-out list to see a doctor regarding this issue.[5]  (Docket no. 27 at 12.)  Plaintiff received a response telling him that he was scheduled to see his provider "about this complaint."  (Docket no. 27 at 12, 13.)  On August 21, 2009, Plaintiff again sent in a kite noting that he is "experiencing serious pain on [his] penis the foreskin and head which has turned colors." (*Id.* at 15.)  He received a response on August 25, 2009,

_____

[4]"PAs perform physical examinations, diagnose and treat illnesses, order and interpret lab tests, perform procedures, assist in surgery, provide patient education and counseling and make rounds in hospitals and nursing homes. All 50 states and the District of Columbia allow PAs to practice and prescribe medications."  *What is a PA*, American Academy of Physician Assistants, *available at*, http://www.aapa.org/the_pa_profession/what_is_a_pa.aspx.

[5]The official response to Plaintiff's kite states that Plaintiff is experiencing "penile discomfort."(*See* docket no. 181-1 at 13.)

indicating that his appointment was scheduled for the next day.  (*Id.* at 16.)

On August 26, 2009, Plaintiff met with Defendant Ouelette.  (Docket no. 181-1 at 40-42.)
Plaintiff "believed he was finally going to receive care for his penis and the severe pain, in part,
because he was scheduled to see his medical provider."  (Docket no. 170-1 at 7.)  Plaintiff states that
Defendant White was only concerned with him signing a form "waiving any liability against the
medical staff" and that the appointment ended without an examination.  (*Id.*; *see also* docket no. 27
¶¶ 36-38.)  The notes from Plaintiff's appointment with Defendant Ouelette indicate that Plaintiff
voiced his complaint over his "other concerns [not being] addressed" and the facility "neglecting
his medical needs."  (Docket no. 167 at 40.)  Defendant Ouelette also noted that Plaintiff "has sent
a kite indicating he has penile pain and discoloration."  (*Id.*)  Defendant Ouelette informed Plaintiff
of the risks in refusing to take his medications and noted that she would "[r]efer to [Dr. Raymond]
Gelabert for evaluation of penile pain and discoloration."  (*Id.* at 41.)  Plaintiff did not sign the
waiver.  (*Id.* at 42.)  This was Plaintiff's only involvement with Defendant Ouelette.

Dr. Gelabert performed an examination of Plaintiff the next day and prescribed a steroid
cream.  (*Id.* at 43.)  Dr. Gelabert's notes indicate that Plaintiff had "a small irritation on the skin"
of his penis for "about one year."  (*Id.*)  He indicated that the affected area included "two localized
spots of irritated, fissured skin, of irregular border, one localized right behind the superior mid gland
and the other on the [left] side close to where the penis shaft starts."  (*Id.*)  Dr. Gelabert noted that
there was "no discharge or bleeding" and opined that "[t]he white skin was very typical of Vitiligo."
(*Id.*)  Plaintiff states that Dr. Gelabert questioned why Plaintiff had waited so long to get a diagnosis
or a treatment plan (docket no. 27 ¶ 38), but Dr. Gelabert's notes acknowledge that Plaintiff had
treated with a hydrocortisone cream for about a month with no improvement and that a biopsy had
been scheduled in April 2009 (docket no. 167 at 43).

Dr. Gelabert prescribed Plaintiff a group V steroid cream and noted that if the cream did not help, he would refer Plaintiff for a biopsy and further management with a dermatologist. (*Id.*) Plaintiff had a biopsy on September 4, 2009 (*see id.* at 44), which returned a result of "Chronic Inflammation and reactive change" (*see id.* at 48). Dr. Gelabert diagnosed Plaintiff with Foreskin Hypopigmentation and told Plaintiff that the color may never return to normal or may take a very long time to improve. (*Id.*)

On September 26, 2009, Plaintiff again refused all of his medications, at which time he met with Dr. Gelabert to discuss his refusal. (*Id.* at 50-51.) At that time, Dr. Gelabert noted that Plaintiff's "Penis discoloration" was stable. (*Id.* at 51.) By May 2011, Plaintiff's condition had deteriorated and his symptoms were "getting worse from the medical treatment." (Docket no. 165-2 at 59.) On June 6, 2011, Plaintiff told his then-treating physician at the MDOC Bureau of Health Care Services that he had "burning pain over the foreskin" and that the creams he had been prescribed were not working, so he requested a circumcision. (*Id.* at 61.) Plaintiff's request appears to have initially been denied because on July 21, 2011, Plaintiff was still complaining to his physician that he was only receiving a cream, which was not working. (*Id.* at 64.) On October 4, 2011, Plaintiff was ultimately diagnosed with Bilantis Xerotica Obliterans (BXO), a chronic, progressive disease that is commonly treated by circumcision. (*See id.* at 69.) Plaintiff was circumcised on January 18, 2012. (*See* docket no. 165-5.)

### B.    Standard of Review[6]

"The court shall grant summary judgment if the movant shows that there is no genuine

---

[6]Although Defendant White styles her Motion as a "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) and/or for Summary Judgment Pursuant to Fed. R. Civ. P. 56," Defendant raises no issues under Fed. R. Civ. P. 12(b)(6) and, instead, argues that "there is insufficient evidence" to support Plaintiff's claims. (*See* docket no. 180 at 4-5.) Thus, the undersigned will consider Defendant White's Motion as a Motion for Summary Judgment.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A moving party may meet that burden "by 'showing' – that is, pointing out to the

district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must support the
> assertion by:
>
> (A) citing to particular parts of materials in the record, including depositions,
> documents, electronically stored information, affidavits or declarations, stipulations
> (including those made for purposes of the motion only), admissions, interrogatory
> answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a
> genuine dispute, or that an adverse party cannot produce admissible evidence to
> support the fact.

Fed. R. Civ. P. 56(c)(1). The Rule also provides the consequences of failing to properly support or

address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address
> another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the
> facts considered undisputed – show that the movant is entitled to it; or
>
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e). "The court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric*

*Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately a district court must

determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," *Hager v. Pike County Bd. Of Education*, 286 F.3d 366, 370 (6th Cir. 2002).

### C.    Analysis

"The Eighth Amendment prohibition on cruel and unusual punishment protects prisoners from the 'unnecessary and wanton infliction of pain.'" *Barker v. Goodrich*, 649 F.3d 428, 434 (6th Cir. 2011) (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)). Where a prisoner claims that such a violation occurred through a lack of proper medical care, "it is not necessary that the . . . officials consciously sought to inflict pain by withholding treatment." *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988). Instead, "[w]here prison officials are so deliberately indifferent to the serious medical needs of prisoners as to unnecessarily and wantonly inflict pain, they impose cruel and unusual punishment in violation of the Eighth Amendment." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). "Fundamentally, the concept underlying the Eighth Amendment is nothing less than the dignity of humankind." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 564, 568 (6th Cir. 2013) (internal quotations, omissions, and modifications omitted).

To support a claim of deliberate indifference under the Eight Amendment, a Plaintiff must satisfy two components–an objective component, and a subjective component. *Id.* (citing *Harrison v. Ash*, 538 F.3d 510, 518 (6th Cir. 2008)). "Satisfying the objective component ensures that the alleged deprivation is sufficiently severe, while satisfying the subjective component 'ensures that the defendant prison official acted with a sufficiently culpable state of mind.'" *Quigley v. Toung Vinh Thai*, 707 F.3d 675, 681 (6th Cir. 2013) (quoting *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003)).

### 1.      The Objective Component

To satisfy the objective component, "'the plaintiff must allege that the medical need at issue is "sufficiently serious."'" *Id.* (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994))).  That is, the plaintiff must show that he "faced a substantial risk of serious harm." *Villegas*, 709 F.3d at 568. But "[t]he objective component further 'requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency'–that is, it 'is not one that today's society chooses to tolerate.'" *Id.* (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).  Therefore, the plaintiff must show that (1) he "faced a substantial risk of serious harm," and (2) the "risk is one that society chooses not to tolerate." *Id.*  There are, however, different theories under which a plaintiff can raise a claim of deliberate indifference with regard to medical needs; for example, a plaintiff may claim that prison officials deprived him of medical care or, in the alternative, that prison officials interfered with a prescribed treatment plan. *See*, *e.g.*, *id.* at 569.

Where a prisoner claims that "a delay in medical treatment rose to a constitutional violation," the prisoner "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty*, 238 F.3d 739, 742 (6th Cir. 2001).  This requirement, however, "is relevant [only] to those claims involving minor maladies or non-obvious complaints of a serious need for medical care." *Blackmore v. Kalamazoo Cnty*, 390 F.3d 890 898 (6th Cir. 2004).  "[W]here a plaintiff's claims arise from an injury or illness 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' the plaintiff need not present verifying medical evidence." *Id.* at 899-900.  "Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." *Id.*  Thus, the Sixth Circuit applies a two-part inquiry.  First, the court

should . . . determine whether the injury was 'obvious," i.e. 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Cain v. Irvin*, 286 Fed.Appx. 920, 927, 2008 WL 2776863, *5 (6th Cir. 2008). If so, "the court must determine whether the delay in securing care was reasonable." *Id.* But if the injury was not apparent or was "relatively minor," the plaintiff "must provide 'medical evidence' demonstrating that the delay in treatment resulted in additional injury." *Id.*

Here, for purposes of both Defendants' Motions for Summary Judgment, Plaintiff has satisfied his burden with regard to the objective component of his deliberate-indifference claim. Plaintiff's condition, BXO, has been diagnosed by a physician. (*See* docket no. 167 at 69, 71.) Moreover, viewing the evidence in the light most favorable to Plaintiff, even a lay person would easily recognize the necessity for a doctor's attention to complaints of "serious pain," cracking, bleeding, and discoloration of the penis. Indeed, the undersigned issued this same finding in 2012:

> Plaintiff has submitted an affidavit that he was in pain. (Dkt. 57, Pl.'s Aff. ¶ 3.) He has further stated that this pain was "chronic pain associated with [his] [penis.]" (*Id.* ¶ 10.) *See also* (Dkt. 55, Pl.'s Resp. to Defs.' Mot. for Summ. J. at 7.) ("The pain that Plaintiff had to endure daily  would be characterized as a burning, constant throbbing, nagging feeling. The pain is intermitted [sic] and most times is exacerbated when urinating and showering. The pain has an average intensity of 7/10.")   These allegations are sufficient to withstand a motion for summary judgment. *See Burton v. Kakani*, 09-10893, 2011 WL 330370, at *4 (E.D.Mich. Aug. 3, 2011) (Battani, J.) ("Courts have regularly held that pain can be a 'sufficiently serious' medical need for purposes of a deliberate indifference claim.")(citations omitted).

(Docket no. 107 at 14-15.) Nothing in the record now before the Court changes this opinion. Indeed, although Defendant White argues that Plaintiff has not satisfied this burden, Defendant Ouelette forthrightly acknowledges that "[i]t is arguable, whether Plaintiff's skin condition, at the time he saw Ms. Ouelette, constituted a serious medical need." Thus, because Plaintiff's condition

has been diagnosed by a physician, and because, at a minimum, the record as a whole presents a

genuine issue of material fact, this matter turns on the subjective component of Plaintiff's claim.[7]

### 2.      The Subjective Component

To satisfy the subjective component of a deliberate indifference claim and show that the

defendant had a sufficiently culpable state of mind, a plaintiff must show that "'the official knows

of and disregards' the substantial risk of serious harm."   *Villegas*, 709 F.3d at 569 (quoting

*Harrison*, 539 F.3d at 518).   The plaintiff need not prove, however, "that the official acted 'for the

very purpose of causing harm or with knowledge that harm will result.'" *Comstock,*  273 F.3d at 703

(quoting *Farmer,* 511 U.S. at 835).   Instead, a plaintiff must show that (1) "the official being sued

subjectively perceived facts from which to infer substantial risk to the [plaintiff]," (2) the official

"did in fact draw that inference," and (3) the official "then disregarded that risk."   *Quigley*, 707 F.3d

at 681 (internal quotations omitted).   Moreover, "[d]irect evidence about a defendant's knowledge

is not necessary, but rather, the knowledge aspect of the subjective component can be determined

["in the usual ways, including inference from circumstantial evidence" *Quigley*, 707 F.3d at 682]."

*Villegas*, 709 F.3d at 569.   For example, "a factfinder may conclude that a prison official knew of

a substantial risk from the very fact that the risk was obvious."   *Quigley*, 707 F.3d at 682; *see also*

*Villegas*, 709 F.3d at 569.

### a.      Defendant White

Defendant White argues that she was unaware of Plaintiff's complaints of pain at the time

she saw him on March 20, 2009, and therefore, Plaintiff cannot show that she had the requisite

---

[7]In addition to arguing that Plaintiff has not met his burden of showing that his condition
was sufficiently serious, Defendant White argues that Plaintiff has failed to provide verifying
medical evidence as required by *Napier* and that his claims should, therefore, be denied.
(Docket no. 180 at 39-40.)   As noted, however, a plaintiff need not provide such evidence where
the seriousness of Plaintiff's condition was obvious.   Thus, Defendant White's argument fails.

knowledge to act with deliberate indifference.  (Docket no. 180 at 33-39.)  In support of this contention, Defendant White argues that Plaintiff has provided no evidence (other than his own declaration) to suggest that he told anyone at ATF about his penile pain or discoloration until he saw Kakani on April 13, 2009, by which time Defendant White had already been transferred to another facility.  (*Id.* at 36-37.)

Plaintiffs medical records support Defendant White's argument.  Nowhere in the 22 pages of medical records spanning the 35 days from his arrival at ARF through his appointment with Defendant White do Plaintiff's medical records even mention a problem with the pain he was allegedly experiencing.  (Docket no. 181-1 at 79-101.)  Notably, several pages of Plaintiff's medical record from this time period have not been provided by Defendants, but Plaintiff has not supplemental these materials, so the undersigned presumes that the missing pages do not support Plaintiff's claim.[8]

In response to Defendant White's arguments, Plaintiff asserts that the reason he did not mention any problems with his penis at his other scheduled appointments is that these appointments were for routine blood-pressure and blood-sugar checks.  Plaintiff contends that "based on [his] many years of confinement and receipt of medical care . . . , when he was called to medical care for a particular reason, such as the checking of blood sugar levels . . . he was not permitted to discuss other medical issues."  (*Id.* at 3.)  Thus, Plaintiff implies, his records do not show any mention of his penile pain because he did not mention it as these various routine check-ups.  Even assuming, *arguendo*, that Plaintiff's contention is accurate, only a portion of these records are from "routine" check-ups.  Plaintiff appears to have made no mention of his penile pain at the time of his arrival

---

[8]This presumption is not intended to imply that the missing pages *hurt* Plaintiff's claim but, merely, that if the pages *supported* Plaintiff's claim, Plaintiff would have provided them.

at ATF, and with the exception of one kite sent for medication renewal on March 7, 2009, Plaintiff does not appear to have submitted a kite regarding this issue or any other. Therefore, Plaintiff can provide no evidence to even suggest that he mentioned his penile pain before his appointment with Defendant White.

With regard to the March 20, 2009, appointment, Plaintiff asserts that he told Defendant White about his penile pain and that she examined him. (Docket no. 186 at 4.) Defendant White states the opposite. (Docket no. 180 at 36.) And while, typically, such a disagreement would present a genuine issue of material fact, Plaintiff's medical record further supports Defendant White's position. Defendant White appears to have spent significant time with Plaintiff during his appointment as she ran a full battery of tests in the ATF Cardiovascular and Endocrine Clinics. (Docket no. 181-1 at 79-87.) She then completed an Orders Summary, which listed the findings of her tests and listed medications and nursing instructions. (*Id.* at 88-89.) Like Plaintiff's other records, these documents make no mention of any penile problems. Moreover, Plaintiff provides no evidence to suggest that he was concerned with a lack of response from Defendant White following his appointment. To the contrary, Plaintiff's initial complaint to ATF staff regarding his penile pain appears to have been made on April 13, 2009, to Kakani, who noted that she "initiated [a consult] for [a] lesion on [Plaintiff's] penis." (*Id.* at 70.)

Plaintiff argues that he "do[es] not control what staff writes in [his] medical records" and that "it would be expected for the Defendant not to place in the medical record evidence that she has done wrong." (Docket no. 186 at 4, 9.) Plaintiff's arguments, however, merely raise some metaphysical doubt as to the material facts, not a genuine dispute. Plaintiff's medical record supports Defendant White's contention that she had no knowledge of Plaintiff's penile pain before, during, or after her March 20, 2009 appointment with Plaintiff. Other than his own declaration,

Plaintiff has not provided a single piece of evidence to support his claim. Thus, the undersigned finds that Defendant White has shown an absence of evidence necessary to support Plaintiff's claim that Defendant White had the requisite knowledge to act with deliberate indifference. Therefore, the Court should grant Defendant White's Motion for Summary Judgment.

### b.  Defendant Ouelette

Defendant Ouelette raises three arguments in support of her contention that she did not act with deliberate indifference to Plaintiff's serious medical needs. First, she argues that she only saw Plaintiff one time and that because "Plaintiff was both argumentative and hostile," she "could not adequately address his complaints," so she "referred Plaintiff on an expedited basis to see Dr. Gelabert." (Docket no. 165 at 22.) Thus, she contends, she did not deprive Plaintiff of treatment; she merely chose a course of treatment with which Plaintiff did not agree. (*Id.* at 22-23.) Second, Defendant Ouelette argues that at the appointment on August 26, 2009, "[s]he was seeing [Plaintiff] for counseling, not an examination, concerning serious medical issues." (*Id.* at 24.) And finally, she argues that "even if Plaintiff alleges that Defendant's actions or inactions caused a delay in treatment or a referral for a test, delay without proof of further injury is not deliberate indifference" under *Napier*.[9]

The first questions the Court must address are whether Plaintiff has provided sufficient evidence to raise a genuine issue of fact regarding whether Defendant Ouelette subjectively perceived facts from which to infer that Plaintiff was suffering from penile pain and whether she did in fact draw that inference. *See Quigley*, 707 F.3d at 681. Defendant Ouelette argues that she was

---

[9]As noted herein, the "verifying medical evidence" requirement set forth in *Napier* only applies when the serious medical condition is not obvious. Moreover, Courts have only applied this standard when determining the objective component of a deliberate-indifference claim. And because Defendant Ouelette has acknowledge that the seriousness of Plaintiff's medical condition is, at least, at question of fact, this argument fails.

meeting with Plaintiff for counseling regarding his refusal to take his medications, not to treat him for his allegations of penile pain.  (*See* docket no. 165 at 24.)

Plaintiff's refusal to take his medication was, according to Plaintiff, in protest of his inability to receive care for his penile pain.  Thus, it stands to reason that Plaintiff would have mentioned his penile pain when Defendant Ouelette discussed his refusal to take his medications.  Defendant Ouelette's notes even indicate that Plaintiff voiced his concerns about the facility neglecting his medical needs.  (Docket no. 167 at 40.)  And in her affidavit supporting her Motion, Defendant Ouelette states that she "reviewed the patient's file" on August 4, 2009, and "noted his history of refusing medication."  (Docket no. 165-3 at 4.)  Assuming that Defendant Ouelette did actually review Plaintiff's file, she would have seen the earlier notes regarding his penile pain, including his treatment in late 2008 and Kakani's examination notes from April 2009.

More importantly, however, Plaintiff's medical records (in particular, the responses to his kites in early August 2009) do not support Defendant Ouelette's contention.  Having received information that Plaintiff refused to take his medication, on August 4, 2009 Defendant Ouelette did schedule an appointment for Plaintiff "to discuss refusal of medications."  (Docket no. 167 at 38-39.)  But two days later, Defendant submitted a kite describing his "serious pain around the foreskin and the head of [his] penis," and he received a response telling him that he would be seen "about this complaint."  (Docket no. 27 at 12-13.)  On August 21, 2009, Plaintiff sent another kite describing the same pain, and he received a response on August 25, 2009, indicating that his appointment for that issue was scheduled for the next day.  (*Id.* at 16.)  Notably, at the time of Plaintiff's appointment on August 26, 2009, Plaintiff did not have any other appointments scheduled with regard to his kites.  Thus, contrary to Defendant Ouelette's contention, viewing this evidence in a light most favorable to Plaintiff, a genuine question of fact exists with regard to Defendant Ouelette's intent to examine

Plaintiff's penis during the August 26, 2009 appointment–even if she also intended to discuss his refusal to take medications.

But even assuming Defendant Ouelette knew about Plaintiff's penile pain, "prison officials who actually knew of a substantial risk to inmate health and safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. That is, "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess the medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). And as noted, this is precisely what Defendant Ouelette argues:

> The fact that [Defendant Ouelette] would not address a condition requiring examination, when [Plaintiff] had been called out for medical counseling, especially when he was argumentative and not in acute distress, is not deliberate indifference. She addressed his needs by scheduling him with a male doctor the next day who could address his concerns about an intimate area. Arranging that appointment is the complete opposite of deliberate indifference.

(Docket no. 165 at 22-23.)

As to Defendant Ouelette's implication that she could not appropriately address Plaintiff's "concerns about an intimate area" because she was not a male doctor, this contention is inapposite. Defendant Ouelette is a licensed PA, and she has provided no evidence to suggest that she was not qualified to examine Plaintiff. Moreover, she has provided no evidence to suggest that Plaintiff was uncomfortable with a female PA. To the contrary, Plaintiff had previously been examined by female PAs without incident.

Regarding Defendant Ouelette's contention that should could not treat Plaintiff because he was argumentative and that he was not in acute distress, Plaintiff stated the opposite in his deposition:

> Q.     [Defendant Ouelette] indicates she assessed you as argumentative.  Is that

             true?  Were you argumentative with her?

       A.      I guess – no, I was not.

(Docket no. 165-4 at 26.)  Aside from their own contentions (and Defendant Ouelette's own notation in Plaintiff's medical record), neither party has provided any evidence to support their account of the events that occurred during the August 26, 2009 appointment.  Thus, and a genuine issue of fact exists as to whether Plaintiff was argumentative and as to whether Defendant Ouelette could have treated Plaintiff that day.  And therefore, viewing this evidence in the light most favorable to Plaintiff, this matter turns on whether Defendant Ouelette's expedited referral to Dr. Gelabert 24 hours later was reasonable.

      Like Plaintiff, Defendant Ouelette makes much of the dichotomy between *Napier* and *Blackmore*, as discussed *supra*.  (*See* docket no. 174 at 4-6.)  Defendant Ouelette draws the Court's attention to *Cain*, 286 Fed. Appx. 920, and *Harrell v. Grainger Cnty*, 391 Fed. Appx. 519 (6th Cir. 2010), to argue that Plaintiff has not provided any medical evidence demonstrating that the delay in treatment resulted in additional injury.  But as noted, such evidence is only relevant to the objective component of the deliberate-indifference inquiry, which the undersigned has already discussed and which Defendant Ouelette acknowledges is "arguable."

      Defendant Ouelette also argues, however, that "Plaintiff cannot demonstrate that he has had any negative impact from the one-day delay" and that the "one-day delay hardly was the basis for [the future] progression [of his BXO]."  (Docket no. 174 at 8.)  Defendant Ouelette cites to *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992), wherein the Court found that a one-day delay in receiving pain medication was not "unnecessary and wanton infliction of pain that violates the cruel and unusual punishment clause."  In *Cain*, however, the Court (before finding that Plaintiff had failed to satisfy the objection component) found that a two-hour delay in receiving care was enough to give

rise to a deliberate indifference claim where the plaintiff "was in great pain and . . . wished to go to the hospital" and the defendant "not only refused this request but mocked and insulted her." *Cain*, 286 Fed.Appx. at 926. Thus, the length of the delay in this matter is not dispositive; the question is whether the delay was reasonable under the circumstances.

Plaintiff contends that Defendant Ouelette knew that he had been in serious pain for months and that she only chose not to treat him on August 26, 2009, because he refused to sign a waiver acknowledging the risks inherent in his refusal to take his medications. If Plaintiff's argument is rejected, this matter is akin to *Caldwell*, and the one-day delay in receiving treatment does not rise to the level of a constitutional violation. If, however, Plaintiff's argument is accepted, and Plaintiff complained of continuous, serious pain, Defendant Ouelette's actions are more akin to the defendant in *Cain*. While Plaintiff does not alleged that he was "mocked and insulted," he does imply that Defendant Ouelette's refusal to treat him was made in retaliation rather than in her best judgment as a caregiver. Indeed, such retaliation could have been for the very purpose of causing pain. Therefore, drawing all justifiable inference in a light most favorable to Plaintiff, the undersigned finds that there is a genuine issue of material fact with regard to Defendant Ouelette's rationale for refusing to treat Plaintiff on August 26, 2009, and therefore, the undersigned recommends denying Defendant Ouelette's Motion for Summary Judgment.

### D.      Conclusion

For the above-stated reasons, the undersigned recommends DENYING Defendant Ouelette's Motion for Summary Judgment [165]. The undersigned further recommends GRANTING Defendant White's Motion for Summary Judgment [180]. Therefore, the undersigned also recommends DENYING Defendant White's Motion to Compel [175] and the Parties Motions for supplement briefing [182] and [184] regarding the same as moot.

III.     **Notice to Parties Regarding Objections**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n Of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Any objections must be labeled as "Objection #1," "Objection #2," etc.  Any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.

Dated:  November 13, 2013                    s/ Mona K. Majzoub
                                             MONA K. MAJZOUB
                                             UNITED STATES MAGISTRATE JUDGE

## **PROOF OF SERVICE**

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: November 13, 2013                    s/ Lisa C. Bartlett
                                                             Case Manager