UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LYNN T. PASLEY,

      Plaintiff,

v.

PATRICIA CARUSO, ET AL.,

      Defendants.

_____/

Case No. 10-11805

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

U.S. MAGISTRATE JUDGE
MONA K. MAJZOUB


**ORDER ADOPTING IN PART REPORT AND RECOMMENDATION [189]; DENYING DEFENDANT OUELLETTE'S MOTION FOR SUMMARY JUDGMENT [165]; AND DENYING DEFENDANT WHITE'S MOTION FOR SUMMARY JUDGMENT [180]**


      Plaintiff, a prisoner of the state of Michigan, alleges that Defendants Ouellette and White—among others—acted with deliberate indifference to his serious medical needs, in violation of his Eighth Amendment right to be spared cruel and unusual punishment.  Defendant Ouellette filed a Motion for Summary Judgment [165] on June 10, 2013.  Defendant White filed a Motion for Summary Judgment [180] on September 26, 2013.[1]  On November 13, 2013, the Magistrate

---

[1] Defendant White styled her motion in the alternative, as either a motion for summary judgment or a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Magistrate Judge correctly characterized the motion as a motion for summary judgment.

Judge issued a Report and Recommendation (R&R) [189] recommending that the Court deny Defendant Ouellette's motion but grant Defendant White's. Defendant Ouellette filed Objections [191] on November 27, 2013. Defendant White filed an Objection [192] the same day, arguing that the R&R should have identified an additional reason for granting her motion.

The Court adopts the R&R's analysis in part. Accordingly, Defendant Ouellette's Motion for Summary Judgment [165] is **DENIED**. Contrary to the R&R's recommendation, Defendant White's Motion for Summary Judgment [180] is also **DENIED**.[2]

### FACTUAL BACKGROUND

The Court adopts the following summary of the relevant facts, as set forth in the R&R:

> According to Plaintiff, on or about September 20, 2008, while incarcerated at the Macomb Correctional Facility, Plaintiff first complained of, and was examined for, a spot on his penis. (Docket no. 27 ¶ 15.) Plaintiff's medical records reflect that this complaint was communicated on or around December 28, 2008. (Docket no. 181-1 at 111.) On January 5, 2009 former Defendant Geml performed a visual examination of Plaintiff's penis. (*Id.* at 110.) Geml's notes indicate that Plaintiff noticed the "rash" on his penis one or two weeks

---

[2] In light of its recommendation that the Court grant Defendant White's Motion for Summary Judgment [180], the R&R further recommended that the Court deny as moot Defendant White's Motion to Compel Complete Answers to Interrogatories [175] and two related motions [182, 184]. Because the Court now denies Defendant White's Motion for Summary Judgment, these discovery motions are not moot. As stated in the R&R, the Magistrate Judge will issue a separate opinion and order on the discovery motions.

earlier and that Plaintiff did not complain of any pain. (*Id.*) Geml diagnosed Plaintiff with hypopigmentation and prescribed a hydrocortisone cream. (*Id.*)

On February 12, 2009 Plaintiff was seen by former-Defendant Noronha, whom Plaintiff alleged examined Plaintiff's penis, discontinued the hydrocortisone cream use, and did not put in place another treatment plan. (Docket no. 27 ¶ 18.) Plaintiff's medical records, however, reflect that Dr. Noronha saw Plaintiff with regard to his hypertension and hyperlipidemia. (*See* docket no. 181-1 at 102-09.) Dr. Noronha's notes neither indicate that Plaintiff discussed the spot on his penis with her, nor that she examined his penis. (*See id.*)

The next day, Plaintiff was transferred to the Adrian Temporary Correctional Facility (ATF), where Plaintiff alleges that he explained to the intake nurse that his condition had worsened. (Docket no. 27 ¶ 19.) Plaintiff maintains that the intake nurse told him that she would put him on a list to see the doctor. (*Id.*) While the intake nurse did order follow-up visits for Plaintiff on February 18, 2009, these visits are listed as "new transfer" visits with a nurse and with Defendant White; her notes do not mention any complaints by Plaintiff regarding his penis. (Docket no. 181-1 at 99-101.)

On February 19, 2009, Plaintiff had a follow-up appointment with a nurse, who performed what appears to have been a full physical examination of Plaintiff. (*See id.* at 95-97.) Plaintiff does not appear to have discussed his penile issues with this nurse, but the nurse did note that a "Scan of Skin" revealed no genital ulcers and no urethral discharge. (*Id.* at 96.) Plaintiff reported to the ATF clinic on February 24, 2009 for a complaint of low blood sugar. (*Id.* at 92.) Plaintiff did not mention any problems with his penis, but he did indicate that "his medications were changed before he [was transferred to ATF], and he wants to discuss his medications with the MP ([Defendant White])." (*Id.*) At that time, Plaintiff was scheduled to see Defendant White three days later. (*Id.*)

In his Amended Complaint, Defendant alleges that he was seen by Defendant White on March 3, 2009. (Docket no. 27 ¶ 20.) It appears, however, that Defendant White did not see Plaintiff until later in March. On March 7, 2009 Plaintiff sent a kite complaining that he still hadn't met with Defendant White and that his blood pressure medication had not been refilled since he was transferred.

3

(*See* docket no. 181-1 at 91.) Plaintiff was told that his medications would be refilled and that he was "on [the] list to be seen" by Defendant White. (*Id.*)

Plaintiff met with Defendant White on March 20, 2009. (*Id.* at 79-89.) Plaintiff states that "[i]t was [his] understanding that [he] was seeing [Defendant] White that day based on [his] earlier requests to see medical staff for the penis pain." (Docket no. 186-6 at 4.) In Plaintiff's Amended Complaint, he alleged that he told Defendant White that his condition had worsened and that the spot that was once small had spread over the entire head and foreskin of his penis, the pain had become unbearable, and the small spot had started bleeding. (Docket no. 27 ¶ 21.) In his Amended Complaint, Plaintiff alleged that Defendant White did not perform a visual examination or provide any treatment. (*Id.*) Plaintiff further alleged that Defendant White stated that she would see Plaintiff at a later time about his condition. (*Id.* ¶ 22.)

In his Response to Defendant White's Motion, however, Plaintiff states that "[a]s a result of my telling [Defendant] White of my penis pain, she examined it," but she "did not want to deal with the penis pain," and "her refusal to provide medical care for the penis pain" caused him to continue to suffer. (*Id.* at 3-4.) Defendant White contends that Plaintiff "made no complaints to [her] regarding his penis, penile discoloration, and/or penile pain," and that "[h]ad [he] made such complaints, [she] would have documented them in the medical record . . . and addressed [them]." (Docket no. 180-3 at 4.) The records from Plaintiff's appointment with Defendant White show that she performed a full examination of Plaintiff in the Cardiovascular and Endocrine Clinics, but the records do not include any mention of Plaintiff's penile pain, discoloration, or discomfort. (*See* docket no. 181-1 at 79-89.) This was Defendant White's only involvement with Plaintiff; on April 1, 2009, Defendant White was transferred to another MDOC facility. (Docket no. 180-3 at 4.)

Plaintiff alleges that on April 2, 2009, former-Defendant Kakani examined Plaintiff's penis but did not make any diagnosis or set up a treatment plan. (Docket no. 27 ¶ 23.) Plaintiff also alleges that he told Kakani about his pain and also discussed with her the alleged referral for a biopsy that Geml had suggested. (*Id.*) Plaintiff states that Kakani said she would submit a request for the biopsy. (*Id.*)

According to Plaintiff's medical records, this examination occurred on April 13, 2009, but Kakani only issued a consultation request. (Docket no. 181-1 at 67, 70.) The consultation-request form noted that the spot on Plaintiff's penis is a "1 cm hypopigmented [a]rea on the penis [with] no crust [and] no drainage." (*Id.* at 67.) She requested that the consultation be performed within one month. (*Id.* at 68.) It does not appear that this consultation ever occurred, but a note from April 16, 2009, indicates that the request "needs to be resubmitted with description of lesion on penis & duration." (Docket no. 167. at 12.) Kakani appears to have amended the request to note that "pt lesion is as discribed (sic) aboe (sic) has for more than month (sic)." (*Id.* at 20.)

On June 24, 2009, Plaintiff was transferred to the Adrian Regional Correction Facility (ARF). (Docket no. 27 ¶ 24.) Plaintiff alleges that when he moved to ARF, he told the intake nurse about his condition, and he alleges that she told him that she would place his name on the list to see the doctor or physician's assistant. (Docket no. 27 ¶ 24.) The first record from Plaintiff's care at ARF that was provided to the Court shows a full examination by former-Defendant Jindal but, like previous records, does not indicate that Plaintiff discussed his penile pain or discoloration. (*See* docket no. 181-1 at 19-28.)

On July 17, 2009, Plaintiff was transferred to the Florence Crane Correctional Facility (AFC). (*Id.* ¶ 26.) He states that, upon his arrival there, he immediately informed the intake nurse of his condition. (*Id.*) He states that the intake nurse informed Plaintiff that she would put him on the doctor or physician assistant list. (*Id.*) Again, however, the health-care screened forms completed by the nurse at ARF and at AFC do not indicate that Plaintiff complained of his penile pain or discoloration. (*See* docket no. 167 at 31-36.) At the time of his arrival at AFC, Defendant Ouellette[3], a licensed Physician Assistant, was assigned as his medical provider. (*Id.* at 35.)

On July 28, 2013, Plaintiff refused all medication from AFC. (*See* docket no. 181-1 at 15.) On July 31, a note in Plaintiff's medical record indicates that Plaintiff "[d]oes not want medical care from this

_____

[3] The R&R consistently referred to Defendant Ouellette as Defendant "Ouelette." For simplicity's sake, the Court has corrected the spelling of Defendant Ouellette's name without the customary use of brackets.

5

facility" and that he had refused several of his medications. (Docket no. 167 at 37.) Plaintiff alleges that he did not see the doctor promptly, so he submitted a health care request and refused all of his medications until a doctor would see him. (Docket no. 27 ¶¶ 27-29.) On August 4, 2009, Defendant Ouellette scheduled an appointment "to discuss refusal of medications," which was set for "approximately 8/21/2009." (Docket no. 167 at 38-39.) And on August 6, 2009, Plaintiff submitted a kite stating, "I am experiencing serious pain around the foreskin and the head of my penis" and noting that he was supposed to have been put on a call out list to see a doctor regarding this issue. (Docket no. 27 at 12.) Plaintiff received a response telling him that he was scheduled to see his provider "about this complaint." (Docket no. 27 at 12, 13.) On August 21, 2009, Plaintiff again sent in a kite noting that he is "experiencing serious pain on [his] penis the foreskin and head which has turned colors." (*Id.* at 15.) He received a response on August 25, 2009, indicating that his appointment was scheduled for the next day. (*Id.* at 16.)

On August 26, 2009, Plaintiff met with Defendant Ouellette. (Docket no. 181-1 at 40-42.) Plaintiff "believed he was finally going to receive care for his penis and the severe pain, in part, because he was scheduled to see his medical provider." (Docket no. 170-1 at 7.) Plaintiff states that Defendant [Ouellette] was only concerned with him signing a form "waiving any liability against the medical staff" and that the appointment ended without an examination. (*Id.*; *see also* docket no. 27 ¶¶ 36-38.) The notes from Plaintiff's appointment with Defendant Ouellette indicate that Plaintiff voiced his complaint over his "other concerns [not being] addressed" and the facility "neglecting his medical needs." (Docket no. 167 at 40.) Defendant Ouellette also noted that Plaintiff "has sent a kite indicating he has penile pain and discoloration." (*Id.*) Defendant Ouellette informed Plaintiff of the risks in refusing to take his medications and noted that she would "[r]efer to [Dr. Raymond] Gelabert for evaluation of penile pain and discoloration." (*Id.* at 41.) Plaintiff did not sign the waiver. (*Id.* at 42.) This was Plaintiff's only involvement with Defendant Ouellette.

Dr. Gelabert performed an examination of Plaintiff the next day and prescribed a steroid cream. (*Id.* at 43.) Dr. Gelabert's notes indicate that Plaintiff had "a small irritation on the skin" of his penis for "about one year." (*Id.*) He indicated that the affected area included

"two localized spots of irritated, fissured skin, of irregular border, one localized right behind the superior mid gland and the other on the [left] side close to where the penis shaft starts." (*Id.*) Dr. Gelabert noted that there was "no discharge or bleeding" and opined that "[t]he white skin was very typical of Vitiligo." (*Id.*) Plaintiff states that Dr. Gelabert questioned why Plaintiff had waited so long to get a diagnosis or a treatment plan (docket no. 27 ¶ 38), but Dr. Gelabert's notes acknowledge that Plaintiff had treated with a hydrocortisone cream for about a month with no improvement and that a biopsy had been scheduled in April 2009 (docket no. 167 at 43).

Dr. Gelabert prescribed Plaintiff a group V steroid cream and noted that if the cream did not help, he would refer Plaintiff for a biopsy and further management with a dermatologist. (*Id.*) Plaintiff had a biopsy on September 4, 2009 (*see id.* at 44), which returned a result of "Chronic Inflammation and reactive change" (*see id.* at 48). Dr. Gelabert diagnosed Plaintiff with Foreskin Hypopigmentation and told Plaintiff that the color may never return to normal or may take a very long time to improve. (*Id.*)

On September 26, 2009, Plaintiff again refused all of his medications, at which time he met with Dr. Gelabert to discuss his refusal. (*Id.* at 50-51.) At that time, Dr. Gelabert noted that Plaintiff's "Penis discoloration" was stable. (*Id.* at 51.) By May 2011, Plaintiff's condition had deteriorated and his symptoms were "getting worse from the medical treatment." (Docket no. 165-2 at 59.) On June 6, 2011, Plaintiff told his then-treating physician at the MDOC Bureau of Health Care Services that he had "burning pain over the foreskin" and that the creams he had been prescribed were not working, so he requested a circumcision. (*Id.* at 61.) Plaintiff's request appears to have initially been denied because on July 21, 2011, Plaintiff was still complaining to his physician that he was only receiving a cream, which was not working. (*Id.* at 64.) On October 4, 2011, Plaintiff was ultimately diagnosed with Bilantis Xerotica Obliterans (BXO), a chronic, progressive disease that is commonly treated by circumcision. (*See id.* at 69.) Plaintiff was circumcised on January 18, 2012. (*See* docket no. 165-5.)

7

## LEGAL STANDARDS

The Court reviews objections to an R&R on a dispositive motion *de novo.* 28 U.S.C. § 636(b)(1)(C).  "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).  The moving party has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The Court must construe the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A genuine issue for trial exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ANALYSIS

Prison medical providers violate the Eighth Amendment when they act with deliberate indifference to prisoners' serious medical needs. *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). A deliberate indifference claim has both an objective prong and a subjective prong. *Id.* (citing *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)). The Sixth Circuit has recently summarized the objective prong as follows:

> The objective component requires a plaintiff to prove a sufficiently serious medical need, which is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. If the plaintiff's claim, however, is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious, the plaintiff must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.

*Id.* (internal citations and quotation marks omitted). To satisfy the subjective prong, a plaintiff must show that the defendant "(1) subjectively perceived facts from which to infer substantial risk to the prisoner, (2) did in fact draw the inference, and (3) then disregarded that risk." *Id.* at 591 (quoting *Comstock*, 273 F.3d at 703).

While a prisoner, Plaintiff suffered chronic pain in his penis and eventually was diagnosed with balanitis xerotica obliterans (BXO). He claims that his

9

condition constituted a "serious medical need" at the time of his medical appointments with Defendants White and Ouellette. He further claims that Defendants White and Ouellette knew of this need but consciously disregarded it. Defendants have both moved for summary judgment. The Court will address Defendants' motions separately.

## I.   Defendant Ouellette's Motion for Summary Judgment

The R&R recommended that the Court deny Defendant Ouellette's Motion for Summary Judgment [165]. Ouellette's motion effectively concedes that Plaintiff has raised a genuine issue of material fact on the objective prong of his claim against her, acknowledging that it is "arguable" whether Plaintiff's condition constituted a serious medical need at the time of his appointment with Ouellette. Accordingly, the R&R found the objective prong satisfied for purposes of this motion. The R&R also concluded that Plaintiff has raised genuine issues of material fact on the subjective prong. First, the R&R found that there was a genuine issue of material fact regarding whether Ouellette knew of Plaintiff's pain when she met with him. Second, accepting Ouellette's assertion that she arranged Plaintiff's next-day appointment with Dr. Gelabert, the R&R determined that even this one-day delay in treatment could constitute deliberate indifference if it were found to be based in a retaliatory motive rather than Ouellette's medical judgment.

10

Defendant Ouellette objects to the R&R's conclusions on the subjective prong.  First, she argues that she did not know Plaintiff had been suffering penile pain at the time of her appointment with him—essentially arguing that she did not believe his complaints.   Second, she argues that she adequately responded to Plaintiff's medical needs by arranging his next-day appointment with Dr. Gelabert. She characterizes her expedited scheduling of an appointment with Dr. Gelabart as a "treatment plan," rather than a denial of or delay in treatment, and points out that a prisoner's mere dissatisfaction with treatment does not give rise to a constitutional claim.

The Court finds Defendant Ouellette's objections unpersuasive.   A reasonable jury could find that Ouellette knew of Plaintiff's pain.  Further, the jury could find that Ouellette, in retaliation for Plaintiff's refusal to sign a release of liability, not only refused to treat Plaintiff herself but also chose to make Plaintiff wait approximately two weeks for his next appointment—an unreasonable delay in treatment averted only by the intervention of a third party.   Accordingly, Defendant Ouellette's Motion for Summary Judgment must be denied.[4]

---

[4] Defendant Ouellette also objects that the R&R improperly considered Plaintiff's amended response [170-1] without allowing Ouellette to file an amended reply.  Plaintiff's amended response does not cite any document that was not already in the record, but does contain a few extra pages of argument concerning the purported purpose of Defendant Ouellette's meeting with Plaintiff.   The Court did not consider the added argument in reaching its conclusion on Defendant Ouellette's Motion for Summary Judgment [165].  Further, Ouellette could not have

11

## A.      Knowledge of Plaintiff's Serious Medical Need

The R&R concluded that Plaintiff has raised a genuine issue of material fact regarding whether Defendant Ouellette knew Plaintiff's pain complaint reflected a serious medical need when she deferred treatment.  The R&R identified three pieces of supporting evidence for this conclusion.  First, Defendant Ouellette reviewed Plaintiff's file approximately three weeks before the meeting, presumably noticing records in his file regarding his penis pain.  Second, Plaintiff sent two kites complaining of his pain shortly before the meeting.  Finally, Ouellette's own notes concerning the meeting indicate that Plaintiff told her of his pain, explaining that he refused to take his medication because the prison was not treating it.

Defendant Ouellette essentially argues that she did not know the seriousness of Plaintiff's medical need because she did not *believe* Plaintiff's pain complaints.  She suggests that even if she saw notes regarding Plaintiff's pain during her review of his file, she could not have remembered those notes at the time of the meeting unless she were "practically omniscient."  She also claims that the record contains no indication that she was aware of Plaintiff's kites concerning his pain.  However, the notes Ouellette prepared immediately after her meeting with Plaintiff—

raised any argument in an amended reply that she could not have raised in her Objections [191]. The Court therefore finds Defendant Ouellette's objection moot.

arguably the most probative piece of evidence in the record regarding Ouellette's knowledge on that day—plainly state that Plaintiff had filed a kite complaining of pain in his penis.  Finally, she claims that Plaintiff did not present objective clinical signs of pain during the meeting, suggesting that she therefore believed his condition was actually painless.

The Court does not engage in factfinding on a motion for summary judgment.  Accordingly, the R&R did not "impute" knowledge to Defendant Ouellette, as she claims.  The R&R merely concluded that, on the current record, a reasonable jury *could* find that Ouellette knew Plaintiff had been suffering significant pain.  The Court agrees with this conclusion.  A reasonable jury may or may not credit Ouellette's claim that she believed Plaintiff was merely experiencing a painless rash or discoloration, despite his willingness to forego medication to obtain treatment.  The Court is not entitled to deprive the jury of responsibility for that decision.

### B.    Disregard of Plaintiff's Serious Medical Need

The Court need not decide—as the R&R did—whether the next-day referral Defendant Ouellette clams to have arranged could constitute a delay or denial of treatment sufficient to constitute deliberate indifference.   Drawing reasonable

inferences in Plaintiff's favor, there is a genuine issue of material fact regarding whether Ouellette actually arranged for Dr. Gelabert to examine Plaintiff's penis on an expedited basis.  A reasonable jury could conclude instead that Ouellette refused to personally treat Plaintiff's serious medical need despite believing he would not be seen by another doctor until approximately two weeks later.  The jury could conclude that this refusal constituted deliberate indifference.  *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899–900 (6th Cir. 2004)  (holding that where a plaintiff's deliberate indifference claim arises from a condition obviously requiring medical attention, the plaintiff need only show he actually experienced the need and it was not addressed within a reasonable time frame).

Plaintiff has offered evidence undermining Defendant Ouellette's claim that she arranged his next-day appointment with Dr. Gelabert.  At his deposition, Plaintiff testified that Ouellette did not tell him she would schedule an appointment regarding his pain, let alone expedite such an appointment.  He further testified that he complained to Deputy Warden Klee about Ouellette's refusal to treat him; that Klee responded he would take care of the situation; and that Klee told Plaintiff the next day that he had taken care of it and Plaintiff would be scheduled to see a doctor.  The prison's records contain additional circumstantial evidence.  Plaintiff filed a grievance against Defendant Ouellette on August 29, 2009, describing their

14

meeting much as he now describes it. Plaintiff appealed the denial of this grievance, and the first-step denial of his appeal stated that Ouellette had not examined his penis because an appointment regarding his pain had been scheduled for September 9, 2009—approximately two weeks after his meeting with Ouellette. In fact, when Ouellette recorded her plan to refer Plaintiff to Dr. Gelabert for an examination of his penis, she wrote the following directly beneath that plan: "MSP [Medical Service Provider] visit approximately 09/09/2009."

On the basis of this evidence, a reasonable jury could find the following: Defendant Ouellette knew that Plaintiff was refusing medication in protest of the prison's delay in treating his painful condition. She therefore knew that if she examined Plaintiff's penis, she would alleviate his concerns and likely convince him to resume taking his medication.[5] She further knew, as she explained to Plaintiff, that his refusal of medication could endanger his health. However, her overriding concern regarding that health risk was the chance that it would result in liability for the prison and possibly herself. Therefore, her priority was to obtain Plaintiff's consent to a release of liability, resulting in conflict when Plaintiff refused. In retaliation for Plaintiff's refusal to sign the release, she declined to examine his penis or to inform him that she would schedule an exam—thus leaving

---

[5] Indeed, Dr. Gelabert's notes indicate that Plaintiff decided to resume taking his medication as soon as the doctor examined him.

intact his reasons for refusing medication.  She referred Plaintiff to Dr. Gelabert for an exam approximately two weeks later, knowing Plaintiff would suffer from his condition and likely continue refusing medication in the interim.  Dr. Gelabert examined Plaintiff the next day only because Deputy Warden Klee intervened.

In sum, a reasonable jury could conclude that Defendant Ouellette knew Plaintiff was suffering persistent, substantial pain in his penis but delayed treatment for approximately two weeks for non-medical reasons.  The jury could therefore conclude that Ouellette acted with deliberate indifference.  *Blackmore*, 390 F.3d at 899 ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates [a] constitutional infirmity.").  Plaintiff has thus raised a genuine issue of material fact on both the objective and subjective prongs of his claim against Ouellette.

## II.    Defendant White's Motion for Summary Judgment

The R&R recommended that the Court grant Defendant White's Motion for Summary Judgment [180].  The R&R reasoned that although Plaintiff has raised a genuine issue of material fact on the objective prong, he has failed to do so on the subjective prong.  Specifically, the R&R concluded that Plaintiff has failed to raise

more than a metaphysical doubt as to whether White knew of his pain complaints at the time of her appointment with Plaintiff.

In her Objection [192], Defendant White does not contest the R&R's conclusion that her motion should be granted. She objects, however, to the R&R's conclusion that Plaintiff has raised a genuine issue of material fact on the objective prong. She argues that the R&R failed to assess the seriousness of Plaintiff's medical needs at the time she allegedly disregarded them. According to White, the R&R impermissibly relied on a diagnosis and symptoms that developed or occurred only *after* White's single meeting with Plaintiff.

The Court is not persuaded by Defendant White's Objection, and therefore agrees with the R&R that Plaintiff has raised a genuine issue of material fact on the objective prong of his claim against White. The Court disagrees with the R&R, however, regarding the subjective prong. Because Plaintiff has raised genuine issues of material fact on both the objective and subjective prongs of his deliberate indifference claim, Defendant White's Motion for Summary Judgment must be denied.

### A.    Objective Prong

The R&R concluded that Plaintiff has raised a genuine issue of material fact on the objective prong. The R&R reasoned that Plaintiff has been diagnosed with

17

BXO by a physician and that even a lay person would recognize the need for medical attention to complaints of serious pain, cracking, and bleeding of the penis.   Defendant White objects that Plaintiff's complaints of serious pain, cracking, and bleeding were not recorded in his medical records until *after* her single meeting with Plaintiff on March 20, 2009.   She further points out that Plaintiff was not diagnosed with BXO until more than two years after she met him. She argues that Plaintiff has therefore failed to raise a genuine issue of material fact regarding whether his penis condition was a serious medical need *at the time she met him.*

The Court disagrees.  It is true that Plaintiff's medical records do not show that Plaintiff complained of penile pain prior to his transfer to the Adrian Temporary Correctional Facility (ATF), or during his incarceration there. However, Plaintiff has alleged that upon arrival at ATF, he complained to an intake nurse that his condition had seriously worsened.  He has further alleged that during his meeting with Defendant White, he told her that his penis was bleeding and he was experiencing unbearable pain.  Further, a physician's record from November 2011 identifies a presumed diagnosis of BXC and indicates that Plaintiff's signs and symptoms began around January 1, 2008—more than a year before his meeting with Defendant White.

18

This evidence does not conclusively establish that Plaintiff suffered serious pain, cracking, and/or bleeding of the penis in March 2009. But a reasonable jury could reach that conclusion. As the R&R concluded, such symptoms constitute a serious medical need because even a lay person would recognize that they require medical attention. *See Blackmore*, 390 F.3d at 899–900. Therefore, Plaintiff has raised a genuine issue of material fact on the objective prong.

### B.    Subjective Prong

The R&R concluded that Plaintiff has failed to raise a genuine issue of material fact regarding whether White, at the time of her meeting with Plaintiff, knew of his serious medical need. The R&R acknowledged that Plaintiff claims he told White about his pain and that White claims the opposite, creating the type of "he-said-she-said" dispute that typically precludes summary judgment. However, the R&R found Plaintiff's account of the meeting less credible, reasoning that the medical records do not state that Plaintiff complained of his pain to White or to any other medical provider at ATF. The R&R therefore discredited Plaintiff's claim to have complained to White about bleeding and unbearable pain, concluding that Plaintiff's allegation raised no more than a metaphysical doubt as to White's knowledge of his condition.

The Court disagrees with the R&R.  Drawing reasonable inferences in Plaintiff's favor, a reasonable jury could conclude the following: Plaintiff informed an intake nurse of his pain upon arrival at ATF, as he claims he did.  The nurse did not mention the pain in her notes because it was her practice to describe new transfer appointments simply as new transfer appointments, rather than specifying the transferred prisoner's complaints.  Plaintiff's conversation with the intake nurse nevertheless led him to expect an upcoming appointment focused on his penis condition, and so he did not discuss his pain during appointments for unrelated matters.  Plaintiff believed his appointment with White was the promised appointment regarding his pain, and accordingly told White about his pain during their meeting.  Defendant White nevertheless did not record Plaintiff's pain complaints in her notes regarding the meeting.

The R&R identified considerable evidence supporting Defendant White's account of her meeting with Plaintiff.  However, the evidence is not so one-sided as to justify this Court finding, before this case reaches a jury, that White is honest and Plaintiff is lying.  A reasonable jury could conclude that Defendant White knew of Plaintiff's serious medical need at the time of their meeting because Plaintiff told her about it, as he claims.  It is undisputed that White did not treat

that need.  Therefore, Plaintiff has raised a genuine issue of material fact on the subjective prong of his claim against White.

CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Magistrate Judge's Report and Recommendation [189] is **ADOPTED IN PART**.

**IT IS FURTHER ORDERED** that Defendant Ouellette's Motion for Summary Judgment [165] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant White's Motion for Summary Judgment [180] is **DENIED**.

**SO ORDERED**.



s/Arthur  J. Tarnow
Arthur J. Tarnow
Dated: November 18, 2014          Senior United States District Judge